UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

SCOTT HANSON,

　　　　Plaintiff,

　　　　v.

BLAINE COUNTY, *et al.*,

　　　　Defendants.

Case No. 1:16-cv-00421-BLW

MEMORANDUM DECISION AND ORDER

## INTRODUCTION

The Court has before it Defendants Gooding County, Shaun Gough, William Shubert, and Jesus Gonzalez's (Gooding County Defendants) Motion for Summary Judgment (Dkt. 66); Defendants Blaine County and Gene D. Ramsey's (Blaine County Defendants) Motion for Summary Judgment (Dkt. 67); and Defendant Judith Peterson's Motion for Summary Judgment (Dkt. 68). Also before the Court is Plaintiff's Motion to Strike (Dkt. 73) and Blaine and Gooding County Defendants' Motion to Strike (Dkt. 79). The Court heard oral argument on June 25, 2018, and now issues the following decision.

## BACKGROUND

The following facts are material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not contradicted by clear documentary evidence in the record. *See Scott v. Harris,* 550 U.S. 372, 380 (2007).

On August 14, 2014, Plaintiff Scott Hanson underwent surgery for removal of cataracts in his right eye. *Wood Decl.* Ex. 1 85:10-25, 87:4-5, Dkt. 71-1 ("Hanson Dep.") Because complications during the surgery prevented Mr. Hanson's surgeon, Dr. William Fitzhugh, from removing all of the lens material, a second surgery was scheduled for August 21. *Id.* Ex. 2 at 1, Dkt. 72-2 ("Fitzhugh Statement"). This surgery went "very well." *Id.* Dr. Fitzhugh also performed surgery on Mr. Hanson's left eye on September 11, without complication. *Id.* Afterwards, Dr. Fitzhugh told Mr. Hanson to continue taking previously prescribed medication, including Prednisone, a topical anti-inflammatory eye drop medicine. *Id.* He also told Mr. Hanson to let him know of any loss of vision, flashing lights, or "floater" phenomena in either eye. *Id.*; *Hanson Dep.* 31:4, Dkt. 71-1. A follow-up appointment was scheduled for two to three weeks later. *Id.*

However, on September 19, Mr. Hanson was arrested for a parole violation, and was not allowed to take his eye drops with him to jail. *Hanson Dep.* 23:17-27:21, Dkt. 71-1. During the booking process, Mr. Hanson told the booking officer, Deputy Hitt, that he needed immediate medical attention because he was taking eye drops for post-cataract surgery care and had not been allowed to bring them. *Davis Decl.* Ex. A, Booking Video, Dkt. 67-4; *Def.'s SOF* ¶ 3. Mr. Hanson also told Deputy Hitt that he was taking five medications: Prozac, Buspar, Ibuprofen, Zyrtec, Prilosec, and one whose name he could not remember. *Davis Decl.* Ex. A, Booking Video, Dkt. 67-4. Mr. Hanson was told that there was no one in the nurse's station at that time and that he would be seen as soon as there was. *Hanson Dep.* 48:8-20, Dkt. 71-1.

As part of the booking process, Deputy Hitt completed a booking form, which both he and Mr. Hanson signed. *Davis Decl.* Ex. B at 4, Dkt. 67-5; *Carey Aff.* Ex. B 54:18-21, 55:2-4, Dkt. 68-6. It contained the following questions and answers:

| Question | Answer |
|---|---|
| Do you need immediate medical attention (if yes, notify medical). | Y MENTAL HEALTH MEDS |
| Do you currently have any health problems? | Y CATARACT SURGERY, MENTAL HEALTH |
| Are you currently taking any medication? | Y PROZAC, BUSPAR, IBPROFEN, ZYRTEC, PRILOSEC, AND ONE UNKNOWN |
| Which pharmacy do you use? | ALBERTSONS |

*Davis Decl.* Ex. B at 4, Dkt. 67-5.

Defendant Peterson was a licensed nurse employed by Correctional Healthcare Companies ("CHC"), which Blaine County contracted with to provide medical care to inmates at the jail. *Carey Aff.* Ex. A 15:24-16:5, 26:4-16, 27:16-20, Dkt. 68-5. After reviewing Mr. Hanson's booking report, Defendant Peterson called Albertsons to verify and order Mr. Hanson's prescriptions. *Peterson Dep.* 49:5-9, Dkt. 71-5. However, she did not order his Prednisone eye drops, despite Mr. Hanson's standing prescription for them at that pharmacy.[1] *Hanson Dep.* 35:5-7, Dkt. 71-1.

Mr. Hanson was held in Blaine County Jail until September 22, and did not remember being seen by any medical personnel during this time. *Hanson Dep.* 49:2-6, Dkt. 71-1. On September 22, Defendant Shubert transported Mr. Hanson to Gooding

---

[1] Defendant Peterson testified that the Albertsons pharmacy did not tell her about any eye drops during the phone call. *Peterson Dep.* 49:5-9, Dkt. 71-5.

County Jail. *Wood Decl.* Shubert Deposition Exhibits 29:8-16 ("Shubert Dep."), Dkt. 71-3. Throughout the drive, Mr. Hanson "complained of [his] eye condition and need for medications and medical attention."[2] *Supp. Wood Decl.* Ex. 1 at 2, Dkt. 75-3.

When Mr. Hanson arrived at Gooding County Jail, he explained his needs to Defendant Gonzalez, the booking officer, and stated that he had been off his medications for 72 hours. *Supp. Wood Decl.* Ex. 1 at 2, Dkt. 75-3; *Hanson Dep.* 30:8-31:6, Dkt. 71-1. Defendant Gonzalez told him that only an emergency would justify seeing medical staff sooner that the regular Wednesday visit, and that he did not think it was an emergency in Mr. Hanson's case. *Id.* In response, Mr. Hanson stated that "this was prescribed medication that [he] needed to be using on an hourly basis" and "reiterated the circumstances regarding [his] eye surgery and [his] need for [his] eye drops and follow-up care." *Id.*

On September 23, Mr. Hanson completed an inmate request form, or "kite," requesting a doctor's appointment and asking that his prescriptions be renewed. *Wood Decl.* Shubert Deposition Exhibits at 23, Dkt. 71-3. The following day, Mr. Hanson was seen by Dr. Olson, the doctor who had a contract to provide medical services to Gooding County Jail detainees at that time. *Hanson Dep.* 30:18-31:9, Dkt. 71-1; *Shubert Dep.*

---

[2] Defendant Shubert testified that he did not recall Hanson telling him he needed eye drops or medical attention. *Shubert Dep.* 45:5-25, Dkt. 71-3. He also testified: "I trust myself that if he would have said something, I would have had further action when I returned back to the jail." *Id.* 45:9-11. However, in resolving the pending summary judgment motions, the Court must accept Hanson's version of this communication.

51:19-23, Dkt. 66-8. Dr. Olson "acknowledge[d] the seriousness of [his] condition and ordered [his] prescriptions, including eye drops, from Kendrick pharmacy." *Supp. Wood Decl.* Ex. 1 at 3, Dkt. 75-3; *Hanson Dep.* 31:7-12, Dkt. 71-1.

Later on September 24, the Gooding County Jail received Mr. Hanson's prescriptions from the Kendrick pharmacy. *Gonzalez Dep.* 31:2-32:6, Dkt. 71-4. Mr. Hanson saw the delivery truck from the pharmacy arrive, but even though he told jail staff that his medicine was on the truck, he was transported back to Blaine County Jail without having received them. *Hanson Dep.* 31:8-23, Dkt. 71-1. He was told that the medicine was too expensive and that he would have to get it at Blaine County Jail. *Id.*

During the drive, Mr. Hansen explained that he was experiencing what looked like "black ink" raining down from the top part of his eye, and that his eye was full of "floaters." *Id.* 32:9-22. When he arrived back at Blaine County Jail, Mr. Hanson immediately demanded to be seen by medical staff because he had lost all sight in his right eye. *Supp. Wood Decl.* Ex. 1 at 5, Dkt. 75-3. They refused, and later that day, Mr. Hanson filled out a kite in which he stated that his eyes were "sore and cloudy." Peterson Deposition Exhibits, Part 2 at 7, Dkt. 71-7.

On September 25, Mr. Hanson told Defendant Peterson that he needed his Prednisone, and that he had just gotten a prescription from Dr. Olson in Gooding. *Carey Aff.* Ex. B 34:4-10, Dkt. 68-6. Defendant Peterson ordered the Prednisone, and Mr. Hanson received it within three hours. *Id.* 34:4-23.

On September 29, Mr. Hanson filed another kite stating "loss of sight in right eye," "need to be seen by outside provider ASAP," and "medication not being dispensed as prescribed." *Wood Decl.* Peterson Deposition Exhibits, Part 2 at 8, Dkt. 71-7. Defendant Peterson called Dr. Fitzhugh's office and spoke with the doctor on call, who told her to send Mr. Hanson to the Twin Falls emergency room. *Carey Aff.* Ex. A 82:3-23, Dkt. 68-5. However, she did not do so, even though she had told Mr. Hanson that they would get him to the emergency room if she could not reach Dr. Fitzhugh. *Hanson Dep.* 115:5-12, Dkt. 71-1. Instead, Mr. Hanson saw Dr. Williams, an optometrist. *Supp. Wood Decl.* Ex. 1 at 4, Dkt. 75-3. By the time Mr. Hanson saw Dr. Williams, he was "completely blind in [his] right eye." *Id.*

Dr. Fitzhugh saw Mr. Hanson on October 1. *Fitzhugh Statement* at 2, Dkt. 72-2. At this time, Mr. Hanson's "visual acuity in his right eye was less than 20/400" and "[h]is intraocular pressure was reduced to zero which is a common concomitant of retinal detachment." *Id.* Though Dr. Fitzhugh immediately referred Mr. Hanson to retinal subspecialists in Boise, a series of surgeries failed to improve Mr. Hanson's vision, which has progressively declined. *Id.* In Dr. Fitzhugh's opinion, "the delay in examination and denial of prescribed necessary medications" was the cause of the decline. *Id.*

On October 31, 2014, Mr. Hanson filed a claim for damages pursuant to the Idaho Tort Claims Act with Gooding County and Blaine County. *Compl.* ¶ 32, Dkt. 46. The claims were denied. *Id.* Mr. Hanson filed a complaint in this Court on September 16, 2016. (Dkt. 1.)

# LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

## ANALYSIS

### 1. Federal Law Claims

County Defendants seeks dismissal of Mr. Hanson's federal claims against them because there has been no showing they were deliberately indifferent to Hanson's medical needs, they are protected by qualified immunity, and there is no basis for municipal liability. Defendant Peterson asks the Court to dismiss all of Mr. Hanson's federal claims against her because Hanson has not shown she was deliberately indifferent to his medical needs. The Court will address each of these arguments below.

#### A. *Deliberate Indifference*

Mr. Hanson claims that Defendants violated his constitutional rights under the Eighth and Fourteenth Amendments through their deliberate indifference to his medical needs while he was incarcerated.

**(1)    Deliberate Indifference Under the Eighth Amendment**

The Eighth Amendment of the United States Constitution protects prisoners against cruel and unusual punishment while incarcerated. Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In the Ninth Circuit, the test for deliberate indifference consists of two parts. *Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006). First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* at 1096. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. *Id.* at 1060. Additionally, a plaintiff must demonstrate that the prison official's actions were both an actual and proximate cause of their injuries. *See Conn v. City of Reno*, 591 F.3d 1081, 1098–1101 (9th Cir.2010), vacated by 563 U.S. 915 (2011), reinstated in relevant part 658 F.3d 897 (9th Cir.2011).

(a)    *Serious Medical Need*

The Ninth Circuit has identified three circumstances in which a medical need may be regarded as serious: "[1] [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; [2] the presence of a medical condition that significantly affects an individual's daily activities; [3] or the existence of chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 113

(9th Cir. 1997). Though the nature of Mr. Hanson's serious medical need changed during the course of his incarceration, a reasonable juror could find that Mr. Hanson had a serious medical need throughout his time in Blaine and Gooding County Jails.

Mr. Hanson's first serious medical need was for post-operative care. Dr. Fitzhugh's instructions to Mr. Hanson after the cataract surgeries indicate that he viewed the condition of Mr. Hanson's eyes to be "worthy of treatment." *Fitzhugh Statement* at 2, Dkt. 72-2. Additionally, when Mr. Hanson returned to Blaine County, he had lost all sight in his right eye and was experiencing pain in that eye. *Supp. Wood Decl.* Ex. 1 at 5, Dkt. 75-3; *Wood Decl.* Peterson Deposition Exhibits, Part 2 at 27, Dkt. 71-7. From these facts, a reasonable juror could find that Mr. Hanson need for post-operative care, along with the failure to receive it, "significantly affect[ed] [his] daily activities," caused him "substantial pain," and was a condition that a reasonable doctor would find "worthy or comment or treatment." *See McGuckin*, 974 F.2d at 1059-60.

Mr. Hanson's second serious medical need was his detached retina. Though it is unclear at exactly what point Mr. Hanson's retina became detached, it seems clear and undisputed that it was at some point during his incarceration, since Dr. Fitzhugh diagnosed the detached retina on October 1. *Fitzhugh Statement* at 2, Dkt. 72-2. A detached retina may constitute a serious medical need. *See, e.g.*, *Herrera-Cubias v. Fox*, 2012 WL 12539503, at *4 (D. Ariz. Sept. 10, 2012); *Trevino v. Browne*, 2010 U.S. Dist. LEXIS 28907, at *22 (S.D. Fla. Jan. 28, 2010).

        (b)     *Deliberately Indifferent Response*

A plaintiff satisfies the second part of the deliberate indifference test—a deliberately indifferent response—by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Jett*, 439 F.3d at 1060. In other words, the plaintiff must show that the prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Jett*, 439 F.3d at 1060. However, an "inadvertent [or negligent] failure to provide adequate medical care" alone does not state a claim under § 1983. *Id.* (citing Estelle, 429 U.S. at 105).

<u>Defendants Ramsey and Gough</u>

Defendant Ramsey was the Sheriff of Blaine County, and Defendant Gough was the Sheriff of Gooding County. *Compl.* ¶¶ 6, 8, Dkt. 46. Mr. Hanson presented no evidence showing that either had knowledge of an excessive risk to his health or safety. Defendant Ramsey testified that he did not know what care was given to Mr. Hanson with regard to his eyes, and that he had never talked to Mr. Hanson. *Ramsey Dep.* 19:18-24, 23:14-18, Dkt. 71-9. Similarly, after Defendant Gough received Mr. Hanson's claim, he discussed it with Defendant Shubert because he "wanted to know that history of it" and "who Scott Hanson was." *Gough Dep.* 21:21-23:12, Dkt. 71-8. That testimony is unrebutted. Therefore, Defendants' motion for summary judgment on deliberate indifference grounds is granted as to Defendants Ramsey and Gough.

## Defendant Shubert

Defendant Shubert was a Gooding County Corporal who, on September 22, transported Mr. Hanson from Blaine County Jail to Gooding County Jail. *Compl.* ¶ 10, Dkt. 46; *Wood Decl.* Shubert Deposition Exhibits 29:8-16 ("Shubert Dep."), Dkt. 71-3. Mr. Hanson testified that throughout the drive, he "complained of [his] eye condition and need for medications and medical attention." *Supp. Wood Decl.* Ex. 1 at 2, Dkt. 75-3. Thus, given Mr. Hanson's version of events, Defendant Shubert knew of a serious medical need and failed to act on that knowledge. Therefore, Mr. Hanson has raised a genuine issue of material fact as to whether Defendant Shubert was deliberately indifferent, and the Court will deny Defendant Shubert's motion for summary judgment.

## Defendant Gonzalez

Defendant Gonzalez was a Gooding County officer who booked Mr. Hanson into Gooding County Jail on September 22. *Compl.* ¶ 11, Dkt. 46; *Supp. Wood Decl.* Ex. 1 at 2, Dkt. 75-3. Mr. Hanson testified that during the booking, he explained his needs to Defendant Gonzalez and stated that he had been off his medications for 72 hours. *Supp. Wood Decl.* Ex. 1 at 2, Dkt. 75-3; *Hanson Dep.* 30: 8-31:6, Dkt. 71-1. Defendant Gonzalez replied that only an emergency would justify Mr. Hanson seeing medical staff sooner that the usual Wednesday jail visit, and that he did not think that Mr. Hanson's case was an emergency. *Id.* In response, Mr. Hanson explained his need for his prescribed eye drops and for follow-up care. *Supp. Wood Decl.* Ex. 1 at 2-3, Dkt. 75-3; *Hanson Dep.* 31:2-6, Dkt. 71-1. Mr. Hanson did not receive his eye drops until September 25. *Carey*

*Aff.* Ex. B 34:4-23, Dkt. 68-6. From these facts, a reasonable juror could conclude that Defendant Gonzalez knew of Mr. Hanson's serious medical need and deliberately failed to respond. Therefore, Defendant Gonzalez's motion for summary judgment is denied.

<u>Defendant Peterson</u>

Defendant Peterson, as a contract nurse, was involved in filling Hanson's prescriptions and overseeing his medical care.  It is undisputed that Peterson called the Albertsons pharmacy on September 20 to verify and order Mr. Hanson's prescriptions, but Mr. Hanson did not receive his prescribed eye drops until September 25. *Peterson Dep.* 49:5-9, Dkt. 71-5; *Carey Aff.* Ex. B 34:24-35:1, Dkt. 68-6. Hanson argues that Defendant Peterson "neglected to order [his] eye drops for him" and that her claim that the pharmacy did not tell her about the drops "is contradicted by the undisputed fact that Scott had them in his possession at the time of arrest, and his testimony that he had an open prescription for the drops at Albertsons." *Pl.'s Resp.* at 7, Dkt. 75; *Hanson Dep.* 35:5-7, Dkt. 71-1.

During oral argument, counsel for Peterson emphasized Mr. Hanson's failure to present evidence of his standing prescription. However, such evidence is not required at the summary judgment stage. As the non-moving party, Mr. Hanson satisfied his burden of rebutting Defendant Peterson's alleged absence of any genuine dispute of material fact through his testimony that he had a standing prescription. In this way, Mr. Hanson went "beyond the pleadings" by showing, through his deposition, that a genuine dispute existed. *See Celotex,* 477 U.S. at 324. Defendant Peterson has not presented any objective

facts that would show Mr. Hanson's testimony to be "blatantly contradicted by the record." *See Scott*, 550 U.S. 372, 380 (2007).

Nevertheless, the Court is not persuaded that there are disputed issues of material fact which preclude summary judgment on this aspect of Hanson's deliberate indifference claim against Peterson. A reasonable juror could conclude that Peterson asked the pharmacy to fill the prescriptions listed on his booking sheet, but did not take the additional step of asking for all open or standing prescriptions which Hanson had at that pharmacy. However, without more, this does not constitute deliberate indifference.

It is true that Peterson was aware from the booking sheet prepared by Officer Hitt that Hanson had listed cataract surgery as a current health problem, and from this it can be inferred that she was aware that the surgery was a recent event. The evidence also indicates that Peterson had some experience treating patients with cataract surgery. But, what is missing, is an understanding that post-operative care invariably requires the regular use of prednisone eye drops. The failure to connect the dots in that regard may have been negligent, but it does not evince the actual knowledge that is necessary to a finding of deliberate indifference.

However, a reasonable juror could find that Peterson was deliberately indifferent in failing to send Hanson to the emergency room. On September 29, the doctor on call at Dr. Fitzhugh's office told Defendant Peterson to send Mr. Hanson to the Twin Falls emergency room. *Carey Aff.* Ex. A 82:3-23, Dkt. 68-5. However, Defendant Peterson did not do so, even though she had told Mr. Hanson that they would get him to the

emergency room if she could not reach Dr. Fitzhugh. *Hanson Dep.* 115:5-12, Dkt. 71-1.

Instead, Mr. Hanson was seen by Dr. Williams, an optometrist, on September 29.

*Peterson Dep.* 104:14-16, Dkt. 71-5; *Supp. Wood Decl.* Ex. 1 at 4, Dkt. 75-3. By the time

Mr. Hanson saw Dr. Williams, he was "completely blind in [his] right eye and scared to

death." *Supp. Wood Decl.* Ex. 1 at 4, Dkt. 75-3. By the time Mr. Hanson saw Dr.

Fitzhugh on October 1, his retina had detached. *Fitzhugh Statement* at 2, Dkt. 72-2. From

this evidence, a reasonable juror could conclude that Defendant Peterson's decision not to

send Mr. Hanson to the emergency room despite her knowledge of the condition of his

eye constituted deliberate indifference.

(c)     *Causation*

Plaintiffs alleging deliberate indifference must show that the defendants' actions

were both an actual and proximate cause of their injuries. *See Conn*, 591 F.3d at 1098–

1101. The parties here have presented competing expert reports as to the cause of Mr.

Hanson's detached retina. County Defendants' expert, Dr. Lefkowitz, testified that "it is

[his] opinion that it was the mishandling of Plaintiff's surgery on his right eye that caused

his retina to detach, and not any failure to use Prednisone for a few days." *Lefkowitz*

*Decl.* ¶ 13, Dkt. 67-11. Conversely, in Dr. Fitzhugh's opinion, "the delay in examination

and denial of prescribed necessary medications" was the cause. *Fitzhugh Statement* at 2,

Dkt. 72-2. Causation is almost always a question of fact. *See, e.g.*, *Lies v. Farrell Lines,*

*Inc.*, 641 F.2d 765, 770 (9th Cir. 1981) ("[c]ausation is generally a question of fact for the

jury"). That is certainly the case here, given the conflicting opinions of the experts.

In summary, the Court finds that disputed issues of material fact exist as to whether Defendants Gonzalez and Schubert were deliberately indifferent regarding Mr. Hanson's need for post-operative care and prednisone eyedrops, and as to whether Defendant Peterson was deliberately indifferent to Hanson's medical need for emergency room care. However, the Court finds that there are no disputed issues of material fact as to whether Defendant Peterson was deliberately indifferent in failing to ensure that Hanson was given prednisone eyedrops.

### (2)    Deliberate Indifference Under the Fourteenth Amendment

The County Defendants argue that Mr. Hanson's due process rights are limited to those under the Eighth Amendment because he was in custody for a parole violation and was therefore not a pretrial detainee. "Claims by pretrial detainees are analyzed under the Fourteenth Amendment Due Process Clause, rather than under the Eighth Amendment." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n.16 (1979)).

However, the standards for these claims are essentially the same under both the Eighth and Fourteenth Amendments. *See Frost*, 152 F.3d at 1130 ("Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment . . . we apply the same standards.") Therefore, it is unnecessary for the Court to decide whether Mr. Hanson was a pretrial detainee because the Eighth and Fourteenth Amendment deliberate indifference claims are governed by the same standard.

**B.    *Qualified Immunity***

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011). To determine whether a government official is entitled to qualified immunity, the Court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, (1) violated a statutory or constitutional right, (2) that was clearly established at the time of the challenged conduct. *Moonin v. Tice,* 868 F.3d 853, 860 (9th Cir. 2017). Courts may use their discretion in deciding which of the two prongs to analyze first. *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

**(1)    Whether Defendants Violated a Constitutional Right**

As discussed above, the Court has concluded that after construing the evidence in a light most favorable to Hanson, there are no disputed issues of material fact that would support any of the claims against Defendants Ramsay and Gough.  However, the Court also concluded that there are material issues of fact as to whether Defendants Shubert and

Gonzalez[3] violated Mr. Hanson's Eighth and Fourteenth Amendment rights by exhibiting deliberate indifference to Mr. Hanson's medical needs. Therefore, the only remaining question is whether those rights were clearly established at the time of the injuries suffered by Mr. Hanson.

### (2)  Whether Mr. Hanson's Right was Clearly Established

County Defendants argue that "the law was not clear as to whether Plaintiff had a right to medical care for alleged medical issues he did not report." *Def.'s Br.* at 10, Dkt. 66-1; *Def.'s Br.* at 12, Dkt. 67-1. However, as discussed in detail above, material factual disputes exist regarding whether Mr. Hanson reported medical issues to Defendants Shubert and Gonzalez.

In September of 2014, it was clearly established that prison officials could not intentionally deny or delay prisoners' access to medical care. *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002). Given Mr. Hanson's version of the events described above, a reasonable juror could find that Defendants Shubert and Gonzalez was deliberately indifferent in delaying or failing to provide Mr. Hanson with access to medical care. Determining whether they are entitled to qualified immunity is entirely dependent on the resolution of these disputed facts. Therefore, the Court denies qualified immunity to Defendants Shubert and Gonzalez. *See Lolli v. County of Orange,* 351 F.3d 410, 421

---

[3] Defendant Peterson does not raise qualified immunity as an affirmative defense in her memorandum in support of her motion for summary judgment (Dkt. 68). Therefore, the Court will not analyze whether she is entitled to qualified immunity.

(denying qualified immunity to defendant officers because of the relevant factual disputes identified by plaintiff).

### C.    *Municipal Liability*

In *Monell v. Department of Social Services,* 436 U.S. 658, 690 (1978), the Supreme Court held that a municipality can be sued as a "person" under § 1983 if the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Id.* at 694. However, a city or county may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior. Id.* at 691.

A plaintiff must satisfy four elements to establish municipal liability for a failure to protect an individual's constitutional rights: (1) the plaintiff possessed a constitutional right, of which he was deprived; (2) the municipality had a policy; (3) this municipal policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the municipal policy is a moving force behind the constitutional violation. *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (9th Cir. 1992). A municipality is not liable under § 1983 for acts of negligence by one of its employees or for the occurrence of an unconstitutional act by the non-policymaking employee. *Davis v. City of Ellensburg,* 869 F.2d 1230, 1234-35 (9th Cir. 1989). Evidence of mistakes made by adequately trained employees or a single unconstitutional action by a non-policymaking employee is not sufficient to show the existence of a custom or policy that violates constitutional rights. *Id.*

A municipality or entity may also be sued under a failure-to-train theory, where the failure to train employees amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact," and the "municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). Ordinarily, to maintain a failure-to-train case, a plaintiff must allege facts showing a "pattern of violations" that amounts to deliberate indifference. *Id.* at 1366. Likewise, "a failure to supervise that is 'sufficiently inadequate' may amount to 'deliberate indifference'" that supports a policy-based claim against a municipality. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir.2011).

### (1)    Failure to Protect Plaintiff's Constitutional Rights

Mr. Hanson has failed to raise a genuine issue of material fact as to whether Blaine County or Gooding County had a policy or custom that was the moving force behind a violation of Mr. Hanson's constitutional rights.

Mr. Hanson's municipal liability claim falters on the second element of the municipal liability test because he has failed to present evidence of a relevant policy. Mr. Hanson cites to no written policy by either Blaine or Gooding County. Neither has he presented sufficient evidence to allow a reasonable juror to find that either county had an unwritten policy or custom that resulted in the alleged violations. An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled city policy." *Monell,* 436 U.S. at 691. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of

sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir.1996) (citations omitted). Mr. Hanson cites to no incidents of alleged deliberate indifference to serious medical needs by Defendants beyond those experienced by himself, and thus fails to show a "persistent and widespread" policy or custom.

Blaine County submitted both its contract with CHC and its Detention Center Policies and Procedures. *Agreement for Inmate Health Care Services*, Dkt. 67-6 ("Agreement"); *Blaine County Detention Center Policies and Procedures*, 67-9. Neither of these policies are unconstitutional on their face or could reasonably be found to have caused or contributed to a deliberate indifference to the medical needs of Blaine County detainees. Through the Agreement, Blaine County contracted with CHC to provide medical care to its inmates. In his response brief, Mr. Hanson correctly states that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *West v. Atkins*, 487 U.S. 42, 56 (U.S. 1988). However, nothing in the contracts suggest that Blaine County impermissibly shifted its constitutional duty to CHC. Rather, the Agreement states that "[p]roviding health care is a joint effort of the Detention Center and the Medical staff . . . [b]oth entities will work together to provide adequate medical care for the protection of the inmate while reducing the risk of liability." *Blaine County Detention Center Policies and Procedures* at 255, Dkt. 67-9.

Mr. Hanson also alleges that a policy existed because of a failure to investigate the unconstitutional acts of lower-level employees. A municipality may be held liable for a constitutional violation under the theory of ratification if an authorized policymaker approves a subordinate's decision and the basis for it. *Lytle v. Carl,* 382 F.3d 978, 987 (9th Cir.2004). However, "[a] mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Id.* The policymaker must have knowledge of the constitutional violation and must make a "conscious, affirmative choice" to ratify the conduct at issue. *Id.; Haugen v. Brosseau,* 351 F.3d 372, 393 (9th Cir.2003) *overruled on other grounds by Brousseau v. Haugen,* 543 U.S. 194 (2004). Mr. Hanson does not appear to allege that any of the Defendants besides Defendants Gough and Ramsey were policymaking officials.

It is true Defendant Gough made a decision that Mr. Hanson's tort claim was frivolous and did not discipline any Gooding County employees, and that Defendant Ramsey handed the claim over to ICRMP without initiating any investigation. *Gough Dep.* 30:25-31:12, 41:14-18, Dkt. 71-8; *Ramsey Dep.* 18:1-5, Dkt. 71-9. However, Mr. Hanson failed to present any evidence showing that Defendants Gough and Ramsey were aware of a constitutional violation on the part of their employees. Defendant Gough made his decision solely on the basis of his conversation with Defendant Shubert. *Gough Dep.* 23:24-24:1, 26:18-20, Dkt. 71-8. Defendant Ramsey, in response to the question "Did you understand at the time that you received and reviewed [Mr. Hanson's tort claim] that Mr. Hanson claimed that he had had cataract surgery and required eye drops and other

medical attention and was not given that attention while he was detained at Blaine County?", answered "No, I never talked to Mr. Hanson at all." *Ramsey Dep.* 19:18-24, Dkt. 71-9. Moreover, persuasive authority indicates that a single inadequate investigation, without more, is insufficient to establish *Monell* liability. *See, e.g.*, *Peschel v. City of Missoula*, 686 F.Supp.2d 1107, 1125-26 (D. Mont. 2009). Therefore, the evidence on record is insufficient to allow a reasonable juror to conclude that either Defendant Ramsey or Defendant Gough approved of the bases for their employees' decisions. *See Lytle,* 382 F.3d at 987.

Finally, Mr. Hanson contends that the counties are liable under *Monell* because they allowed policy decisions to be made by lower-level officials that led to the violations, citing a 2015 decision of this Court in support. *See Savage v. City of Twin Falls*, 2015 WL 1635252, at *12 (D. Idaho Apr. 13, 2015) ("[A] city cannot 'escape liability for the consequences of established and ongoing departmental policy regarding the use of force simply by permitting such basic policy decisions to be made by lower level officials who are not ordinarily considered policymakers.'") (citing *Chew v. Gates,* 27 F.3d 1432, 1445 (9th Cir. 1994)). As discussed above, lower level officials did make decisions that a reasonable juror could find amounted to deliberate indifference. However, Mr. Hanson has not shown that these decisions were so frequent as to constitute a policy designed by lower level officials. Mr. Hanson cites to no incidents of alleged deliberate indifference to serious medical needs by Defendants beyond the ones he experienced himself. Thus, the alleged "policy decisions" made by lower-level

officials were more like instances of "a single unconstitutional action by a non-policymaking employee," and thus insufficient to show the existence of a custom or policy that violated Mr. Hanson's constitutional rights. *See Davis,* 869 F.2d at 1234-35.

### (2) Failure to Train

Mr. Hanson's failure to train theory fails for the same reason that his unwritten policy or custom theory did: he has not shown a "pattern of violations" that amounts to deliberate indifference. *See Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

## 2. State Law Claims

In his complaint, Mr. Hanson alleges violations under the Idaho Tort Claims Act ("ITCA"), Idaho Code Title 6, Chapter 9. Mr. Hanson also alleges that Defendants' misconduct constituted gross negligence and/or willful, wanton, and reckless conduct within the meaning of Idaho Code § 6-904C. On August 28, 2017, the Court granted County Defendants' motion to dismiss Mr. Hanson's state law claims against all defendants except Gooding County and Blaine County.[4] (Dkt. 44.)

The ITCA, specifically Idaho Code § 6–903, "establishes that governmental entities are subject to liability for their own negligent or wrongful acts, and those of their employees who were acting within the course and scope of their employment." *Hoffer v. City of Boise*, 257 P.3d 1226, 1228 (Idaho 2011). However, the ITCA expressly exempts certain causes of action. Specifically, it provides that so long as a governmental entity

---

[4] Defendant Peterson did not file a motion to dismiss.

and its employees is "acting without malice or criminal intent," they will not be liable for claims arising out of "performance or the failure to exercise or perform a discretionary function," Idaho Code § 6-904(1), or arising out of the "providing or failing to provide medical care to a prisoner." *Id.* § 6-904B.

The Idaho Supreme Court has held that, for both of these provisions, the clause beginning "acting without" applies only to "employees," and not to "governmental entity." *Bates v. 3B Det. Ctr.*, 2016 WL 1755404, at *2 (D. Idaho May 2, 2016) (extending the interpretation of Hoffer, which held that "[t]he plain language of the first clause of [§ 6-904] exempts governmental entities from liability for the torts it lists," to § 6-904B). In other words, "no matter how the employees acted," Idaho governmental entities cannot be liable for any claim arising under either of these provisions. *Id.* In his complaint, Mr. Hanson did not specify into which ITCA category, if any, the challenged actions fell. Defendants characterize them as falling under the "discretionary functions" (§ 6-904(1)) and "medical care" (§ 6-904B(5)) provisions, and Mr. Hanson does not dispute this characterization in his response brief. Thus, because Blaine and Gooding County, as governmental entities, are immune from claims brought for acts arising under § 6-904(1) and § 6-904B(5), the Court will grant summary judgment as to Mr. Hanson's state law claims against Blaine and Gooding County.

The Court will also grant summary judgment to Defendant Peterson on Mr. Hanson's state law claims. Mr. Hanson states in his complaint that his state law claims are brought pursuant to Idaho Code Title 6, Chapter 9. However, this chapter applies only

to governmental entities and their employees. *See* Idaho Code § 6-903(1) ("Except as otherwise provided in this act, every *governmental entity* is subject to liability for money damages arising out of its negligent or otherwise wrongful acts or omissions *and those of its employees* acting within the course and scope of their employment or duties . . . .") (emphasis added). Additionally, this chapter's definition of employees specifically excludes contractors like Defendant Peterson:

> "Employee" means an officer, board member, commissioner, executive, employee, or servant of a governmental entity, including elected or appointed officials, and persons acting on behalf of the governmental entity in any official capacity, temporarily or permanently in the service of the governmental entity, whether with or without compensation, but the term employee *shall not mean a person or other legal entity while acting in the capacity of an independent contractor under contract to the governmental entity* to which this act applies in the event of a claim.

Idaho Code § 6-902 (emphasis added).

Defendant Peterson was a licensed nurse employed CHC, which Blaine County contracted with to private medical care to inmates at Blaine County Jail. *Carey Aff.* Ex. A 15:24-16:5, 26:4-27:20, Dkt. 68-5. Therefore, she was a "person . . . acting in the capacity of an independent contractor under contract" to Blaine County, and not an "employee" within the meaning of the ITCA. For this reason, Mr. Hanson's claims

brought under the ITCA are inapplicable to her, and the Court will grant summary judgment as to Mr. Hanson's state law claims against her.[5]

## 3. Motions to Strike

The Court has before it Plaintiff's Motion to Strike (Dkt. 73) and County Defendants' Motion to Strike (Dkt. 79)[6].

### A. *Plaintiff's Motion to Strike*

Mr. Hanson moved to strike the following declarations submitted by the County Defendants: Declaration of Andy Hoffman (Dkt. 66-3); Declaration of Todd A. Lefkowitz (Dkt. 66-4); Declaration of Jay Davis (Dkt. 67-3); and Declaration of Todd A. Lefkowitz (Dkt. 67-11). In each of these declarations, the declarant's signature was represented in the form of a typewritten "/S/" above his type-written name. Mr. Hanson claims that this kind of electronic signature is acceptable only for "registered participants" in the CM/ECF system, according to Rule 13 of this Court's Electronic Case Filing (ECF) Procedures. Because the County Defendants offered no proof that the

---

[5] Additionally, to the extent that Mr. Hanson argues Defendant Peterson engaged in medical malpractice, he has failed to meet his burden of proof. Under Idaho law, a plaintiff in a medical malpractice case must prove by expert testimony that the defendant failed to meet the applicable standard of care in the local community. *See* Idaho Code § 6-1012. In regard to the applicable standard of care, the report of Mr. Hanson's expert witness, Dr. Fitzhugh, stated only that "any reasonable person should have allowed [Mr. Hanson] to be examined by an ophthalmologist." *Fitzhugh Statement* at 2, Dkt. 72-2. This general statement is insufficient to meet the requirements of Idaho Code § 6-1012. Therefore, Mr. Hanson has failed to meet his burden of proof in his medical malpractice claim against Defendant Peterson.

[6] Gooding County Defendants joined Blaine County Defendants in their Motion to Strike. *Def's Br.* at 1-2, Dkt. 78.

declarants were registered participants, Mr. Hanson argues, the declarations are inadmissible.

Rule 13 provides:

> A Registered Participant filing a Verified Pleading electronically shall insure the electronic version conforms to the original, signed pleading/document. Each signature on the original, signed pleading/document shall be indicated on the electronically filed Verified Pleading with the typed name on the signature line of the person purported to have signed the pleading/document. The electronic filing of a Verified Pleading constitutes a representation by the Registered Participant that he or she has the original, signed document in his or her possession at the time of filing.

*United States District and Bankruptcy Courts for the District of Idaho Electronic Case Filing Procedures*, ¶ 13 (amended March 23, 2018), https://www.id.uscourts.gov/content_fetcher/?Ref_ID=828&ID=1972.

Here, Mr. Hanson does not dispute that County Defendants' attorney Blake Hall was a registered participant or that the declarations are verified pleadings. Mr. Hall filed each of the challenged declarations electronically, with a typed name of the declarant on the signature line in each declaration. Therefore, the challenged declarations comply with Rule 13, and the Court will deny Mr. Hanson's motion to strike.

**B.** *County Defendants' Motion to Strike*

The County Defendants moved to strike the Supplemental Declaration of William Fitzhugh (Dkt. 75-5). Because the Court did not rely on the evidence asserted in this declaration, it will deny the motion as moot.

## ORDER

**IT IS ORDERED:**

1.    The Blaine County Defendants' Motion for Summary Judgment (Dkt. 67)

      is **GRANTED in part and DENIED in part** as explained above.

2.    The Gooding County Defendants' Motion for Summary Judgment (Dkt. 66)

      is **GRANTED in part and DENIED in part** as explained above.

3.    Defendant Peterson's Motion for Summary Judgment (Dkt. 68) is

      **GRANTED in part and DENIED in part** as explained above.

4.    Defendants' Motion to Strike (Dkt. 79) is **DENIED**.

5.    Plaintiff's Motion to Strike (Dkt. 73) is **DENIED**.

DATED: July 9, 2018

B. Lynn Winmill
Chief U.S. District Court Judge